HEIRS OF EMILIO DÁVILA, Plaintiffs and Appellants, v. OFELIA COLLAZO DE SATORRA, Defendant and Appellee.

No. 5051. Argued November 6, 1929.—Decided June 20, 1930.

*Colberg & Barceló Jr.* and *Romero & Campos del Toro* for appellants. *Ulpiano Crespo Jr.* for appellee.

MR. JUSTICE HUTCHISON delivered the opinion of the Court.

The district court, after a trial on the merits, dismissed an action of unlawful detainer upon the theory that a conflict of title was involved.

The question is whether the case should be governed by

a group of authorities cited by the district judge or by a line of decisions relied upon by appellants.

Francisco Dávila died in December, 1928. His brother, Inocencio Emilio Dávila, obtained a declaration of heirship, and also died. Plaintiffs herein were then decreed to be the sole and universal heirs of Inocencio Emilio Dávila. Thereafter, but prior to the commencement of the present proceeding, Ofelia Collazo and Carmen Martínez brought an action against plaintiffs herein, wherein they prayed for a judgment containing the following pronouncements:

"A. That it was the firm and decided intention of Francisco Dávila Dávila that plaintiffs Ofelia Collazo widow of Satorra, and her sister Carmen Martínez, should be the true heir and legatee, respectively, of the estate left by said predecessor.

"B. That there was a contract between plaintiffs and said Francisco Dávila Dávila, which was carried out by both parties before the death of the latter, for valuable consideration, and this entitles plaintiffs upon the death of said Francisco Dávila Dávila to obtain the possession and ownership of the estate.

"C. That the declaration of heirship in favor of Inocencio Emilio Dávila as universal heir of Francisco Dávila Dávila is null and void, inasmuch as said Francisco Dávila Dávila prior to his death disposed of his property and rights in behalf of plaintiffs as his heirs-apparent.

"D. That any other relief consistent with the allegations of plaintiffs be granted . . . "

As the introductory part of a basis for the relief so sought, plaintiffs in the previous action, nieces of the predeceased wife of Francisco Dávila Dávila, alleged in a sworn complaint that they had lived from childhood and for more than twenty years with their uncle and aunt, Francisco Dávila and wife, who had treated them always as adopted children; that in 1916 Ofelia had married Pedro Satorra and later had gone with him to Spain; and that in July, 1921, Francisco Dávila had written her as follows:

"Utuado, Porto Rico, July 23, 1921. Mrs. Ofelia Collazo Satorra, Alguaire, Lérida. From the letter of Dr. Massot, of July 5,

that you must have received, I presume you are informed of my great misfortune—the death of my beloved Margarita. May she rest in peace! I can not forget her for a moment. I hope that you and Satorra will always remember her in your prayers. I was sick prior to her death, but always looked after her. The day following her death I was obliged to go to bed and have been very ill. I am recovering, but Dr. Massot has not discharged me, although I am strong enough to write to you, which I could not do before. I shall be glad to know that you are all well. I shall make my last will and testament in your favor, and shall retain the usufruct of the lands left to me by Margarita, for purposes of management, sale, etc.; but I shall leave the farming lands in the hands of your husband, don Pedro Satorra, to work them to your benefit, allowing me a monthly income so that I may modestly live the remaining days of this constant suffering. These farms, with all of their appurtenances, such as cattle, woodlands, coffee plantations and other improvements—house, machinery—may yield a good annual income to intelligent and vigorous people as you are, and it would be folly to undersell them. I have not enough courage to continue their management, and Margarita always told me, I WISH TO LEAVE THIS PROPERTY TO OFELIA BECAUSE. I KNOW SHE WILL BE THE ONLY ONE CAPABLE OF PRESERVING IT. Last year's coffee crop yielded 123 cwt. in the dry shell, at the town, and the coffee in the berry gathered from the ground and in the hull, yielded about 309 cwt., and I can not take care of it. This year the crop is smaller due to lack of grubbing. I shall begin to grub next week. The farm is in debt for about $2,000, and it would be nice if Satorra could bring this money from Spain. Dr. M. says that if I can procure that amount from the bank at 4½% interest hé would furnish it to me so that you may take possession of the land free from encumbrances. It would be well if you could come as soon as possible, so as to be in time to take care of the present crop and avoid the annoyance of winter and anarchism. Everything is quiet here in this regard, although there is no peace and we are always forced to struggle for existence. The farm has over 125 *cuerdas* planted in coffee, but it will yield over 800 cwt. within two or three years, if replanted. Little vigilance during the crops diminishes the production. My dear *Compadre:* Think the matter over and see if it is convenient for you to come, and if you can move to this island as soon as possible, so that you may take charge of the farm. I have an honest young man on it, but he can not attend to everything alone and it will be necessary to employ two more, which, of course, will dimin-

176

ish the profits. Coffee has advanced in price. Some days ago hulled coffee sold at $15. It has come down to $12, but once business is normalized it can produce good profits. The tobacco business is slack, though for more than a month I know nothing about it. Everybody took advantage of the rise in price. Linden (*majagua*) wood is exploitable. There are on the property four horses, three mares, two colts, four cows, two bulls and four calves. If you could cable whether or not you are able to come, it would be a great relief to me. I am living at the town house and shall be glad to have you come here so that you may be comfortably settled. Your '*Compadre*' who wishes you resignation and fortitude, Francisco Dávila.''

Next the complaint sets forth that this letter was followed by further correspondence in confirmation of the promise made and the obligation assumed by the said Francisco Dávila that plaintiffs would be his heirs or beneficiaries and, acting upon this understanding, Ofelia Collazo and her husband, Pedro Satorra came from Spain to Porto Rico in March, 1924, and lived in the home of Francisco Dávila; that the consideration for Dávila's contract to make plaintiffs his heirs was the love and affection he professed for them; that in return for such love and affection and in consideration of the benefits accruing to them from the agreement, plaintiffs rendered personal services to the said Dávila, lavishing upon him a degree of care and consideration of such a peculiar and exceptional character that plaintiffs could not be compensated in money, but only in the manner and form proposed by Dávila; that the said Dávila was ill for a long time but in the full exercise of his mental powers up to the time of his death, and while confined to his bed, and in order to carry out his agreement with plaintiffs wrote the following memorandum:

''Fco. Dávila Dávila, widower of doña Margarita del Rosario (with no other surname) has no descendants or ascendants. He was born in Juncos. He leaves as his universal heir Ofelia Collazo (with no other surname), married to Pedro Satorra Giró, and resident in the Province of Lérida, town of Alguaire, the natural daughter of Juliana Collazo. She shall make a legacy in favor of Carmen Mar-

tínez Collazo, single, legitimate daughter of Pedro Martínez Collazo and Juliana Collazo (with no other surname). He appoints Octavio Vivó Nicoláu as executor, and Eduardo Artáu as partitioner.''

This is followed by various averments as to the nonexistence of forced heirs, as to an estrangement of the two brothers, as to statements made by Dávila to his friends indicative of an intention and purpose that his property should go to plaintiffs, and other matters.

In the present proceeding the record of the previous action was introduced in evidence, and the admission thereof is assigned as error. The objection in the court below was on the ground of immateriality and irrelevancy, coupled with a statement that a pending controversy between the parties does not prove anything beyond the fact that a suit has been filed in the clerk's office. The argument in the brief for appellants goes to the question of probative value rather than to that of admissibility. For the purposes of this opinion, it may be conceded that a verified complaint, without more, does not establish the facts alleged therein when introduced in evidence in another action. It was not incumbent on defendant herein to establish the facts alleged by her and her sister in the previous action. Nor need we determine whether or not proof of the commencement of another action suffices to show that the respective rights of the parties are ''more or less in dispute'' within the meaning of that term as used by the Supreme Court of Spain in its decision of January 4, 1900, and by this court in a number of cases. See *Mehrhof* v. *Rodríguez et al.*, 14 P.R.R. 56; *Succession of Colón* v. *Colón et al.*, 27 P.R.R. 81.

If the evidence of that fact has any bearing on the question as to the existence of a conflict of title, it is relevant. If it has sufficient probative value to serve as an appreciable makeweight in passing upon that question, it is material.

This court, however, has repeatedly announced that ''when the defendant alleges some title to the possession of the property, unless all evidence to sustain such allegation

is lacking, ejectment should not be decreed and the question of legal title to the property should be settled in an ordinary action before the action of unlawful detainer can be brought.'' See *Torres et al.* v. *Pérez,* 18 P.R.R. 557, 559; *Miranda* v. *Camerón,* 19 P.R.R. 465, and *Andino* v. *Canales,* 27 P.R.R. 262. Another way of putting it is that ''when in an action of unlawful detainer against a tenant at sufferance the defendant alleges in his answer that he does not hold possession in such capacity but holds as owner and introduces evidence which apparently shows that his possession is not at sufferance, the action of unlawful detainer should not be sustained.'' *Gandía* v. *Cabán,* 22 P.R.R. 773, 775–776.

It may be that the complaint in question does not state facts sufficient to constitute a cause of action. Perhaps it could not even be amended so as to state a good cause of action. The summary proceeding of unlawful detainer does not afford a reasonable opportunity for the investigation and determination of these questions. Assuming without deciding that a trial court may be required to pass upon such matters, as going to the question of admissibility of evidence in an action of unlawful detainer, every reasonable doubt should be resolved in favor of the sufficiency of the pleading.

A perusal of the opinion in *Pastor-Gomila* v. *Miró-Pastor,* 34 P.R.R. 50, will suffice to distinguish that case from the one at bar and at the same time to show that the sworn complaint herein above outlined is not a sham complaint. The fact that such a complaint has been filed tends to show the good faith of defendant's claim of ownership and right of possession pending a determination of such claim although there is no presumption of bad faith. It shows that the title to the property in question in the unlawful detainer proceeding is directly involved in a pending litigation. It is some evidence of a cloud on plaintiffs' title. It is, therefore, neither irrelevant nor immaterial.

At the trial herein Ofelia Collazo testified that from the time she was ten years old she had lived with her uncle and

foster father Francisco Dávila; that three years after her marriage, she went with her husband, Pedro Satorra Giró, to Spain; that while she was in Spain Dávila wrote monthly to her and her husband; that she returned to Porto Rico after the death of her aunt because Dávila wrote her of his intention to make her his sole heir, and sent for her to take care of him because he was very ill; that he paid her passage and she arrived in Porto Rico in April, 1924 and went to live in his home; that on her arrival he confirmed the offer already made; that her husband had trouble with the immigration authorities, and was detained in Cuba; that Dávila told her to take care of him pending the arrival of her husband and said that when the question of her husband's admission was settled he would keep his promise, and that he kept it; that witness and her sister took care of Dávila up to the time of his death; that on his death bed he ratified his agreement; that after his death, witness and her brothers were left in charge of the estate; that witness continued to live as owner, in the house where she had lived, and her brothers continued in charge of the rural properties; that witness and her sister, Carmen Martínez, claim the estate, as the owners thereof; that witness is still living in the house as owner; that it was left to her by her uncle and foster father Francisco Dávila, and that witness had brought an action for the recovery of her inheritance, promised and left to her by Francisco Dávila.

On cross-examination counsel for plaintiffs elicited the further information that Dávila had left a will in favor of witness; that he told her sister that he had left it in the Ponce Bank; that the will had been drawn by an attorney, Marín Marién; that the will was made shortly after the death of Dávila's wife in 1921; that Marín told witness he had drawn the will; that Marín did not give her copy "because we had the memorandum or a simple copy"; that witness has the simple copy, which will be produced in evidence in the other action; that witness did not bring it with

her to the trial because no request for its production had been made; that Eduardo Artau and Octavio Vivó were named therein as executors; that the will is dated 1921; that Marín told witness he had taken the will to Dávila to be signed and that "it had been made in my favor"; that Dávila always said that his will had been made in favor of witness; that Dávila had made a signed will; that witness does not know whether or not the will drawn by Marín was signed before him; that witness was in possession of the estate by virtue of her contract with Dávila to come and, with her sister, to take care of him upon the understanding that he would leave them in possession of their inheritance in compensation for their services; that Dávila told his friends that witness was his only heir; that he left witness and her sister in possession of the inheritance in compensation for their services; that he left a simple copy of the will; that Marín told witness he had drawn the original and had taken it to Francisco Dávila, and that witness found the unsigned memorandum.

The testimony of this witness is not very satisfactory. On direct examination it stops short of the memorandum alleged to have been made by Dávila just before his death. There is a marked variance between the averment as to the existence of this memorandum and the reference to a simple copy or proposed draft of a will drawn by an attorney in 1921. Nevertheless, if the statement was not true, a door was opened wide for impeachment, and plaintiffs failed to take advantage of this opportunity. We can not assume that if the attorney Marín Marién had been put upon the stand, he would have told a different story.

In any event the testimony of Ofelia Collazo covers the entire ground of the previous action in its narrower aspect as indicated by the caption, wherein it is described as an action for the specific performance of a contract. Whether or not the complaint, regarded as a suit for specific performance of contract, states facts sufficient to constitute a

cause of action is a matter which, for reasons already stated, need not now be determined. The district court was not trying the case of Ofelia Collazo and Carmen Martínez v. Eugenio R. Dávila Marrero et al. It was disposing of an action of unlawful detainer.

Defendant claims a right to the possession of the house in which she lives. Plaintiffs' alleged right as owners of the property to evict defendant as a tenant at sufferance is "more or less in dispute." It can hardly be said that "all evidence to sustain" defendant's claim "is lacking." It follows that there is a conflict of title in the sense in which that term is used in our previous decisions.

Among the cases relied upon by appellants, the one nearest in point, perhaps, is *León* v. *Alvarado,* 24 P.R.R. 654. There plaintiff, in the unlawful detainer proceeding, had obtained his title to the property in question as the result of a previous action between the same parties. The second paragraph of the headnotes reads as follows:

"The fact that the defendant in an action of unlawful detainer pleaded the nullity of the action in which the plaintiff acquired the property sued for in the action of unlawful detainer, is no ground for holding that the plaintiff has not a sufficient title to support a judgment in his favor; for until the said action and sale are annulled his title is good and he continues as the owner with the right to compel the defendant to vacate the property."

Here defendant does not seek to vacate a judgment rendered in a previous action between herself and plaintiffs, nor to set aside a judicial sale made as the result of such action. The proceeding for a declaration of heirship assailed by defendant was an ex parte proceeding. Her title to the property involved in the unlawful detainer proceeding does not depend upon any irregularity or defect in the proceeding for a declaration of heirship. It emanates from an antecedent source. She does not seek to establish her claim through the annulment of plaintiffs' title, but relies upon an independent title alleged to be superior to that of plain-

tiffs. The doctrine of the *León* case is manifestly inapplicable.

*Hernández* v. *Algarín*, 30 P.R.R. 786, turned upon section 641 of the Civil Code which requires that a gift of real property shall be evidenced by a public instrument. Article IV of the chapter on wills contains no such provision.

A casual examination of *Lafontaine et al.* v. *Lafontaine et al.*, 30 P.R.R. 184, and *Marrero* v. *Plumey*, 35 P.R.R. 930, will distinguish them from the case at bar.

The judgment appealed from must be affirmed.